NEWMAN, Circuit Judge,
dissenting.
The court today holds that a person who performs the requested test of a material that is provided to him for testing for a specified use, can then, when the test is successful, patent the material he was provided, for the use for which it was tested. My colleagues hold that Dr. David Goldfarb, who was provided with Gore-Tex® tubular material for testing as a vascular graft in dogs, can patent as his own the Gore-Tex material that Gore employees provided to him, and assert the exclusive right to the use for which the material was provided. My colleagues hold that Dr. Goldfarb then can enforce this patent against the provider of the Gore-Tex material that he tested. My colleagues on this panel endorse and defend these errors and improprieties, and now rule that Gore is the willful infringer of this improperly obtained patent on Gore’s product and use. My colleagues find no blemish in this history of incorrect law, impropriety, questionable advocacy, and confessed perjury. I respectfully dissent.
Discussion
The saga of the patent in this suit starts in February 1973, when employees of W.L. *1194 Gore & Associates, in connection with an ongoing program led by Gore’s Plant Manager Peter Cooper, invited Dr. Goldfarb at the Arizona Heart Institute to participate in testing the Gore-Tex expanded polytetrafluoroethylene (ePTFE) for use as a vascular graft. Gore-Tex ePTFE had already been successfully tested as vascular grafts in dogs and sheep, by surgeons at various universities and hospitals. Peter Cooper and Gore employee Richard Mendenhall visited Dr. Goldfarb, told him of the material, its properties, and the results obtained and in progress, and invited him to participate in the testing program. Dr. Goldfarb accepted the invitation, and Cooper provided him with several Gore-Tex tubes with the ePTFE structures that had been found to be most effective as vascular grafts, in studies by the other researchers. Dr. Goldfarb then implanted in dog arteries the Gore-Tex tubes that Cooper provided, observed that the material was indeed effective, and in October 1974' filed a patent application on the effective Gore-Tex graft materials and this use, naming himself as the inventor.
Gore had already filed a patent application on the effective Gore-Tex graft materials, with Peter Cooper as inventor. Prosecution continued for twenty-eight years, including a patent “interference” that lasted for eighteen years, with two appeals to the Federal Circuit. On August 20, 2002 the Patent and Trademark Office (“PTO”) issued a patent to Dr. Goldfarb. In 2003 Goldfarb and his then-assignee, the C.R. Bard Company, sued Gore for patent infringement.
The record shows Gore’s extensive experience with these Gore-Tex graft materials, experience that preceded Dr. Goldfarb’s entry into Gore’s testing program, including various prior art activities of record in the PTO. Dr. Goldfarb acknowledged in the interference proceeding that use of Gore-Tex ePTFE as a mammalian graft had been known as early as 1970 or 1971, when Dr. Ben Eiseman of the University of Colorado began testing Gore-Tex vascular grafts. Brief for the Junior Party David Goldfarb, Interference No. 101,100, PX 116.6818 at 6, in Bard v. Gore, No. CV 03-0597-PHX-MHM. Dr. Goldfarb also acknowledged to the PTO that “[a]t about the same time, Dr. Matsumoto in Tokyo, Japan, obtained a sample of expanded PTFE tubing and implanted it in dogs as a small diameter graft,” and “Matsumoto reported a 100% success rate.... ” Id. at 7. Dr. Matsumoto, of the Department of Thoracic Surgery of the University of Tokyo, published several scientific articles on this work, e.g., Matsumoto et al., “Studies of Porous Polytetrafluoroethylene as a Vascular Prosthesis: Application to Peripheral Arteries,” Artificial Organs, Vol. 1, No. 1, p. 44 (1972). Another Matsumoto publication, in Surgery, Vol. 74, No. 4, p. 519 (October 1973) states that “Gore-Tex tubes manufactured by W.L. Gore Associates” were implanted in dogs for up to ten months. The Surgery article states that after the implant period “the internal surface of the grafts were visualized macroscopically and microscopically,” and includes photomicrographs of the Gore-Tex tubes showing the fibrous and internodal structure that is claimed in the Goldfarb patent. Figure 3 of the Surgery article is a photomicrograph “of an expanded polytetrafluoroethylene prosthesis removed ten months after operation. The neointima is very well developed and firmly adherent to the inner surface”; properties that the jury (and the PTO) was told were discovered by Dr. Goldfarb. Figure 4 is a “microscopic picture of an expanded polytetrafluoroethylene prosthesis removed 4.5 months after operation. Fibroplasis is well formed through pores”; these are all properties that the jury and *1195 the PTO were told were discovered by Dr. Goldfarb.
In 1972, well before Dr. Goldfarb was first contacted by the Gore employees, an internal memorandum written by Cooper entitled “Who Is Doing What With GORE-TEX Veins and Arteries and Other Experiments,” dated August 15, 1972, reports experiments conducted by Dr. Jay Voider of the University of Utah, using Gore-Tex tubes provided by Cooper, for vascular grafts in sheep:
4. University of Utah: Dr. Jay Void-er — Jugular Vein, Carotid Arteries 5.3 and 9.9 mm. On Dr. Kolff s Staff.
10 sheep each. Arteries are perfect. Some veins clotted in a few weeks. When smaller, more porous tubes were used as veins, they did not clot but the intima “was not well adhered”. Do not know if higher flow rates or more porous structure was cause of better success — could be both. We will supply even more highly expanded 5 mm material, .2-.3 gms/cc compared to .53 which he used. He plans to write a paper.
PX 116.17703, Bard v. Gore, No. CV 03-0597-PHX-MHM. A trip report by Cooper dated November 3, 1972 states:
Dr. Voider has had excellent success in GORE-TEX arteries and veins. The artery work has been perfect using two densities of GORE-TEX: the vein work only when the lower of the two densities was used. Our letter to Dr. Voider describing the properties of the two tubes he has used is in the University of Utah file.
Id., PX 116.17766. Dr. Volder’s work was published, “A-V Shunts Created In New Ways,” Transactions of the Amer. Soc. for Artificial Internal Organs, Vol. 20, p. 38 (November 1973), in which Dr. Voider described the structure and properties of the Gore-Tex materials, and stated: “It is believed that by increasing the average pore size of the material, at the moment 5 |r [microns], it will be possible to accelerate the process of tissue infiltration and the development of capillaries.” Id. at 39.
Several other surgeons had previously tested the Gore-Tex material as vascular grafts in dogs. In November 1972 Cooper provided Gore-Tex tubes of various fibrous structures to Dr. William J. Sharp at the Akron City Hospital and Dr. Glenn Kelly at the University of Colorado Medical School. This activity is summarized in Cooper v. Goldfarb, 154 F.3d 1321 (Fed.Cir.1998) (“Cooper I”), the court stating that “In the spring of 1973, the researchers participating in the three-structure experiment began obtaining results.” Id. at 1324. The court stated that in “a letter dated April 2, 1973, Dr. Sharp informed Cooper that two of his grafts had been successful.” Id. at 1324. Dr. Sharp described the characteristics of fibroblastic infiltration and the nature of the neointima as viewed by microscope — characteristics that Dr. Goldfarb stated were his discovery. Dr. Sharp provided his photomicrographs to Mr. Cooper, and wrote:
RESULTS: Group 1-416-10312-3 (.31g/ cc). There were a total of four grafts inserted into the dog’s carotid artery. Two remained patent in the same animal for 21 days and 2 clotted before 21 days in another animal. The low power microscopic views demonstrate excellent fibroblastic infiltration of the wall of the graft (Figure # 1) and a fairly thick, but well attached neointima (Figure #2). There was only moderate reaction externally. (Figure # 3).
PX 116.17829, Bard v. Gore, No. CV 03-0597-PHX-MHM.
This court also reviewed Dr. Kelly’s studies, at the University of Colorado, of various Gore-Tex materials as vascular grafts in dogs, in which Dr. Kelly identi *1196 fied the structures that were most effective. The court summarized Dr. Kelly’s histological studies and microscopic investigation of tissue ingrowth — characteristics that Dr. Goldfarb claimed as his discovery. The Federal Circuit summarized this work:
On April 17, 1973, Dr. Kelly sent Cooper four histological slides of harvested grafts. Cooper testified that he reviewed the slides under a microscope on April 22, 1973, and then photographed the slides, measured the fibril lengths shown, and recorded his conclusions in his laboratory notebook. The first page of Cooper’s notebook contains a photo-micrograph of a harvested graft along with a notation indicating that the graft was submitted by Dr. Kelly. The page also contains a sticker with a 100 micron scale indicated.
The following is written above the photomicrograph:
I want to maximize the amount and rate of tissue ingrowth into Gore-Tex vascular prosthetics. Two qualities are necessary. 1. Uniform “poker chip” structure and 2. a minimal “skin” at both the O.D. and I.D. surfaces.
Tissue has invaded Gore-Tex where the nodes are approx. 10-30 microns thick and with most separations between nodes at about 50-100 microns. Photo # 1. Other structures having approximately 5-10 micron node dimensions and spaces from about 5-30 micron do not appear to allow in-growth-Photo # 2.
Cooper I, 154 F.3d at 1325. This court referred to Kelly’s photomicrographs showing tissue ingrowth and internodal separation, yet Dr. Goldfarb, before the jury, accused Cooper of stealing Goldfarb’s photomicrographs showing tissue ingrowth and internodal separation. By the time of trial, Cooper had died, leaving Dr. Goldfarb uncontradicted.
Dr. Goldfarb had told the PTO that it was “well known in 1972 and before” that for tissue ingrowth in a vascular graft, the internodal distance must be “at least the size of a fibroblast or red blood cell,” that is, “in the range of 5-6 microns,” so that the cells can infiltrate the ePTFE pores. Goldfarb Decl., April 26, 1984 at ¶¶4-6; PX 116.9772, Bard v. Gore, No. CV 03-0597-PHX-MHM. This is the internodal distance that all of the investigators who preceded Goldfarb had observed to characterize the effective Gore-Tex graft materials. Yet at the infringement trial the jury was told that it was Goldfarb who discovered that Gore-Tex ePTFE had these properties and performance.
Dr. Goldfarb conceded at the infringement trial that he knew nothing about Gore-Tex or ePTFE before the Gore employees suggested that he participate in the test program for these materials:
Q. Dr. Goldfarb, do you agree that the idea of trying out ePTFE tubes as an artificial vascular prosthesis was something that was first suggested to you by two Gore employees, Peter Cooper and Richard Mendenhall?
A. Yes.
Q. Before the Gore employees told you about trying ePTFE as a vascular prosthesis, you didn’t know anything about that material, correct?
A. That’s correct.
Q. And the first suggestion from Gore came in about February 1973 I think you said; is that right?
A. That’s correct.
Trial Tr. 677:20-678:3, Nov. 8, 2007. The record contains the following letter from Peter Cooper dated February 14, 1973, written after this initial contact:
Dear Dr. Goldfarb,
*1197 Enclosed are a variety of sizes of GORE-TEX tubes for your animal artery prosthetic experiments. I have also enclosed a short length of tubing with a small flange at each end and wonder if an anastomosis technique where a similar flange if formed on the end of the artery and butted against the GORE-TEX prosthetic might not be a better technique than suturing the butt ends together.
We want to do whatever we can to help you with your project. When additional materials or further information is needed, do not hesitate to let us know.
Very truly yours,
/s/ Peter B. Cooper
Plant Manager
PX 116.13350, Bard v. Gore, No. CV 03-0597-P/-IX-MHM.
On April 19, 1973 Cooper sent Dr. Goldfarb additional Gore-Tex tubes, with a letter stating that these materials “represent the latest attempt to achieve satisfactory patency rates in small artery prosthetics,” based on the ongoing work of the other surgeons in the project. The Federal Circuit summarized Dr. Goldfarb’s participation:
Following a meeting with Cooper and Mendenhall in early February, Goldfarb set up an animal research facility at AHI. Over the next several months, Cooper periodically sent Goldfarb a variety of expanded PTFE tubes to use in his research. Using the samples provided by Cooper, Goldfarb conducted a series of experiments consisting of 21 grafts implanted in the left and right carotid and left and right femoral arteries of seven dogs.... Goldfarb began obtaining results from these experiments towards the end of May of 1973.
Cooper I, 154 F.3d at 1325-26.
Dr. Goldfarb obtained results that conformed to the results that had been achieved by the other surgeons, and then filed a patent application on the Gore-Tex materials that he had received from the Gore employees. He claimed, for use as vascular grafts, the materials that he had been provided by Gore for this purpose. He claimed these materials by the tubular shape and size and density of the materials that he had been provided, and by the internodal structure of the materials that he had been provided and that he, and others before him, had observed to provide effective tissue ingrowth.
After eighteen years of interference proceedings, the PTO granted the patent to Goldfarb, although the PTO found and the Federal Circuit affirmed that Cooper was the first to conceive of the invention, including the specified internodal structure, and held that Goldfarb’s work “inures to Cooper’s benefit”:
Applying the Genentech [v. Chiron Corporation, 220 F.3d 1345 (Fed.Cir.2000) ] test to these facts, we hold that Goldfarb’s recognition that the 2-73 RF graft from the Lot 459-04133-9 material was suitable for usé as a vascular implant inures to Cooper’s benefit.
Cooper v. Goldfarb, 240 F.3d 1378, 1385 (Fed.Cir.2001) (“Cooper II”). Goldfarb had sold his rights to International Medical Products and Research Associates (“IMPRA”), a company that had been formed by former Gore employees, and that was sued by Gore for infringement of trade secrets. Goldfarb later recovered his patent rights, and sold them to Bard. Goldfarb and Bard then sued Gore for infringement. The jury found infringement by Gore’s entire line of Gore-Tex graft human prostheses.
The infringement trial was fraught with errors of law, misstatements of fact, and confessed perjury by Dan Detton, a witness in this case to whose testimony my *1198 colleagues on this panel give weight. Mr. Detton admitted to perjury concerning Goldfarb’s activities in testimony that Detton gave in the trade secret litigation between Gore and IMPRA, and Detton admitted that his false affidavits had been filed in the Patent Office to support Dr. Goldfarb’s patent application. At the infringement trial, after Mr. Detton had been called by Gore to testify as to various aspects of the relationship between Gore and Dr. Goldfarb, Gore’s counsel introduced Detton’s affidavits and brought out Mr. Detton’s prior false testimony:
Counsel: Is this the second affidavit that you signed in that meeting in January of 1976?
Mr. Detton. Yes, it’s one of the two.
Counsel: If you would turn to paragraph 15, please, of Exhibit 8220 [the second affidavit]. And it’s stated there that prior to the applicant’s disclosure of the structure defined in the above-identified application, affiant, that’s you, was unaware of any other vascular structure which incorporated a thin wall (in the range of thicknesses between 0.2 and 0.8 millimeters). Do you see that?
Mr. Detton: Yes.
Counsel: Is that a factually accurate statement, Mr. Detton?
Mr. Detton: No, that would be inaccurate. That’s contradictory to the findings that we were having, and the results.
Bard v. Gore, No. CV03-0579-PHX-MHM, Examination of D. Detton, Trans. 1897:19-1898:6 (Nov. 27, 2007). Bard’s counsel, in turn, also addressed the falsity of Mr. Detton’s prior testimony:
Counsel: You were asked, “As far as I can tell — inform me if I’m correct and tell me if I’m wrong — the specifications for the next 64 graft verification experiments were set forth by Dr. Goldfarb about mid-June of 1973; is that about correct?”
Your answer, “Correct.”
Is your testimony there knowingly false or truthful?
Mr. Detton: No, that was inaccurate testimony.
Counsel: Was it knowingly false?
Mr. Detton: Yes, it was.
Counsel: Perjury?
Mr. Detton: Yes, it was.
Bard v. Gore, No. CV03-0579-PHX-MHM, Trans. 1915:5-15 (Nov. 27, 2007).
The panel majority complains about my reference to Mr. Detton’s admissions of perjury, stating that it is not our appellate role to determine credibility. I am not determining Mr. Detton’s credibility: he did that for us. He admitted that he lied in the testimony that he gave in support of the Gore ex-employees who formed the company IMPRA to which Goldfarb initially assigned his patent rights, and who were sued by Gore for misappropriation of trade secrets. He admitted that he lied in the affidavits that were filed with the patent examiner and that achieved allowance of the Goldfarb application. This is not an appellate assessment of credibility — there is no credibility to assess.
The panel majority also misstates that the Matsumoto and Voider articles were “fairly considered” as “prior art in this appeal,” for the jury was told that the patent examiner had fully considered these articles and had granted the patent in light thereof. It is now admitted that the Detton affidavits, filed in the PTO to distinguish these articles, were perjured; Detton testified that he had told Dr. Goldfarb and Goldfarb’s counsel that he wanted to withdraw the affidavits, and they refused.
Goldfarb’s counsel used the cross-examination of Detton as a platform for misstating to the jury that “the Federal Circuit *1199 and the patent office determined Dr. Goldfarb had come up with this invention,” for both the Federal Circuit and the Patent Office had determined that Cooper, not Goldfarb, had conceived the invention. Such misstatements to the jury are typified by this exchange:
Counsel: The date up there at the top is 22-10-73. Do you understand that to be October 22,1973?
Mr. Detton: I would assume.
Counsel: And this is, just so we orient ourselves, some four or five months after the Federal Circuit and the patent office determined Dr. Goldfarb had come up with this invention.
Trial Tr. 1958:17-23, Nov. 27, 2007.
Dr. Goldfarb also told the jury that the Federal Circuit held that the Patent Office “affirmed the patent” — although neither had done so.
Counsel: Okay. And this is the March 2001 opinion that — what was the impact of this opinion? This is the federal-second Federal Circuit opinion, Dr. Goldfarb. What’s the impact of this opinion?
Dr. Goldfarb: It says that judgment— that the decision made by the patent office affirmed the patent.
Trial Tr. 707:17-22, Nov. 8, 2007. In a travesty of flawed proceedings, in which almost all of the witnesses were dead, unwilling, or hostile, misstatements of law and fact abound.[1]
As a matter of law, Dr. Goldfarb cannot deprive Gore of the invention Gore possessed and that was known to Gore and published by others before Goldfarb entered the scene. A person who tests a material provided to him for testing, in the test for which the material was provided, does not become the inventor of the material and the use for which he tested it, and does not thereby become the owner of the material with the sole right to the use he was invited to test. As stated in Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed.Cir.1985), “An inventor ‘may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.’ ” (quoting Hobbs v. U.S. Atomic Energy Comm’n, 451 F.2d 849, 864 (5th Cir.1971)).
The panel majority states that Dr. Goldfarb invented “a homogeneously porous vascular prosthesis” with “small nodes interconnected by extremely fine fibrils to form an open superstructure which will allow uniform, controlled transmural cellular ingrowth and thereby assure the establishment and maintenance of a thin, viable neointima as well as firm structural integration of the graft into the body.” Maj. Op. at 1176. That is incorrect; the product that the panel majority describes is the Gore-Tex product that the Gore employees invited Dr. Goldfarb to test as a vascular prosthesis; it was not invented, designed, created, or produced by Goldfarb. The Gore employees provided Goldfarb with known samples having small nodes interconnected with fibrils, of the density and wall thickness and internodal distance of the samples that others had previously successfully tested as graft prostheses. They were not Goldfarb’s invention.
The panel majority also misstates, or misunderstands, the findings of the interference, and the prior Federal Circuit rulings. This court held that Cooper had conceived the entire invention before, not after, Goldfarb’s purported reduction to *1200 practice. This court found that Cooper had provided Goldfarb with the material that he tested, and that by “letter to Goldfarb accompanying the Lot 459-04133-9 material, Cooper described the material as representing] the latest attempt to achieve satisfactory patency rates in small artery prosthetics, indicating that he expected the material to be suitable as a vascular graft.” Cooper II, 240 F.3d at 1381. The court “h[e]ld that Goldfarb’s recognition that the 2-73 RF graft from the Lot 459-04133-9 material was suitable for use as a vascular implant inures to Cooper’s benefit.” Id. at 1385. The court’s inquiry into “whether Cooper can obtain the benefit of Goldfarb’s knowledge of the fibril lengths of the material Goldfarb tested” was directed to the interference contest between Cooper and Goldfarb, for it was undisputed that Cooper had knowledge of the structure of the successful products before Goldfarb tested the successful products.
Thus this court held in Cooper I that Cooper had conceived the invention, including the fibril length limitation, before Goldfarb reduced the invention to practice. 154 F.3d at 1326. The letter from Dr. Sharp dated April 2, 1973 related to the Lot 459-04133-9 material, and Cooper’s letter to Dr. Goldfarb on April 19, 1973 accompanied the Lot 459-04133-9 material and described it as “representing] the latest attempt to achieve satisfactory patency rates in small artery prosthetics.” Cooper II, 240 F.3d at 1384. This was the material that Dr. Goldfarb patented as his own, although pictures of the fibrous structure of the Gore-Tex grafts had been made known to Cooper by Dr. Sharp and Dr. Allen, and had been published by Dr. Matsumoto and Dr. Voider.
Whatever Dr. Goldfarb’s contribution, he did not invent the effective graft materials. The “microscopic superstructure of uniformly distributed nodes interconnected by fibrils,” as the product is described by the panel majority, was the known structure of the Gore-Tex materials that others had already successfully tested as grafts at Gore’s request. The “uniform, controlled transmural cellular ingrowth and thereby assure the establishment and maintenance of a thin, viable neointima as well as firm structural integration of the graft into the body,” was recorded in Cooper’s laboratory notebook before Goldfarb was first contacted by Cooper and Mendenhall. In Cooper II the court observed that the graft identified as 2-73 RF had been successfully tested before it was given to Goldfarb, and that Cooper “expected the material to be suitable as a vascular graft” and “intended that Goldfarb use the [material] for vascular grafts, and to that extent Goldfarb’s experiments could be said to have been performed at Cooper’s request.” 240 F.3d at 1384.
At the infringement trial, Gore raised the separate defense to the infringement charge, that even if the Goldfarb patent is not now subject to challenge, Gore’s employee Cooper, who was acknowledged to have conceived the invention, was at least a “joint inventor” in terms of 35 U.S.C. § 116. The panel majority cites several cases to negate any access to joint inventorship, although this court had already found that Cooper conceived the invention that Goldfarb patented. Precedent illustrates that “inventorship” and “joint invention” have been disputed in a variety of situations, although none reached a result that entirely excluded the person who conceived the invention that was patented. I review the cases relied on by the panel majority to support the exclusion of Cooper as an inventor:
In Nartron Corp. v. Schukra U.S.A., Inc., 558 F.3d 1352 (Fed.Cir.2009), the question was whether an additional em *1201 ployee of the patentee should have been joined as an additional inventor; it was held that the decision of joinder depended on whether the additional employee made a significant contribution; but the persons who conceived the invention were not thereby excluded. In Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352 (Fed.Cir.2004), the question was whether the information discussed during various technical meetings on possible collaboration led to joint invention; it was held that it depended on which ideas were discussed and their relation to the patented subject matter. In University of Pittsburgh v. Hedrick, 573 F.3d 1290 (Fed.Cir.2009), the question was whether a research assistant was a joint inventor along with the senior scientists; the court held that the assistant was not a joint inventor because the invention had already been conceived. The court recognized the rule that invention turns on conception, not reduction to practice. In Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed.Cir.1997), the court explained that 35 U.S.C. § 116 “sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor. Rather, a joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed.” In Pannu v. Iolab Corp., 155 F.3d 1344 (Fed.Cir.1998), the patent application was already on file when the claimant to joint inventorship status appeared as a possible licensee; the invention had already been conceived. In Hess v. Advanced Cardiovascular Sys., 106 F.3d 976 (Fed.Cir.1997), doctors who were working on a new catheter obtained technical advice and samples of material from a purveyor of Raytheon tubing; the court held that this did not convert the adviser into a joint inventor of the catheter.
None of these determinations rejecting “joint invention” tracks the facts herein. No precedent holds, or suggests, that a person who tests a material provided by someone else, for the use for which the material was provided, becomes the sole inventor of the material he was provided and the sole inventor of the use for which he was invited to test the material provided. The cases cited by the panel majority support Gore’s position, not Goldfarb’s, for in all cases the person who conceived the invention was an inventor, whether or not other persons had also contributed sufficiently to be included in inventorship.
At the infringement trial, the jury found that Cooper and Goldfarb were not “joint inventors,” apparently because of Goldfarb’s testimony that they did not have an “open line of communication during ... their inventive effort,” as the district court instructed the jury. Jury Instr. # 25, Doc. 769-2, p. 40-41 (“Persons may be joint or co-inventors even though they do not physically work together, but they must have some open line of communication during or at approximately the time of their inventive effort.”). I take note that witness Dan Detton, whose direct supervisor was Peter Cooper, testified that he was assigned to visit Dr. Goldfarb weekly during this work.
The jury was told, over and over, that the Federal Circuit had decided that Dr. Goldfarb was the sole inventor (although the Federal Circuit found that Cooper, not Goldfarb, conceived the invention); that Cooper and Goldfarb did not communicate; and other aspects that Cooper, in death, could not contradict.
Whether or not there was some form of joint invention that could include Goldfarb, Gore cannot be excluded from the right to continue to do that which it disclosed to Goldfarb and had previously been published by Matsumoto and Voider. Even on Goldfarb’s theory that he made useful observations, it has been clear since General *1202 Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 249, 66 S.Ct. 81, 90 L.Ed. 43 (1945), that “It is not invention to perceive that the product which others had discovered had qualities they failed to detect.” See In re Kubin, 561 F.3d 1351, 1357 (Fed.Cir.2009) (the discovery of an inherent property of a known composition does not render the composition patentable to the observer of the inherent property).
The PTO found and the Federal Circuit affirmed that Cooper was the first to conceive the invention, and that Cooper provided Goldfarb with the material embodying the invention for further testing by Goldfarb, see Cooper I, 154 F.3d at 1330. These rulings have never been challenged, even in the conceded perjured testimony, and totally negate the panel majority’s claims on behalf of Goldfarb. The law has heretofore been clear that a person who tests a product provided by another, for the purpose designated by the provider, cannot acquire the exclusive right to that product for that use, to the exclusion of the inventor of the use. Such a rule violates the most fundamental premises of patent law and property rights. The panel majority’s endorsement of such a rule will breed much mischief, to the disruption of routine testing relationships.
My colleagues, applying these flawed rulings, affirm that Gore willfully infringed the Goldfarb patent on the product that Gore invented, developed, and commercialized. My colleagues hold that Bard, who purchased Goldfarb’s rights, is entitled to all of Gore’s profits on all Gore-Tex graft materials. Yet the entire history is permeated by errors of fact and law, lies, inconsistencies, and injustice. In Shatterproof Glass, 758 F.2d at 626, this court stated that “If prejudicial error occurred, or if the verdict is against the clear weight of the evidence, as an alternative to judgment n.o.v. a new trial may be granted, in the discretion of the trial judge.” It is apparent that “the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.” Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940). See Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (1933) (a new trial should be granted when justice requires). At a minimum a new trial is required, lest we “make a scarecrow of the law.”[2] From the panel majority’s ratification of this insult to judicial process, I respectfully dissent.

. I take note of the panel majority’s observation that this saga has overtones of a Shakespearian tragedy, for these events indeed illustrate that "to be honest, as this world goes, is to be one man picked out of ten thousand.” W. Shakespeare, Hamlet, Act II, sc. ii.

. We must not make a scarecrow of the law,
Setting it up to fear the birds of prey,
And let it keep one shape, till custom make it
Their perch and not their terror.
W. Shakespeare, Measure for Measure, Act II, sc. ii.